**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SAMSON BROWN, et al. | : | Civ. No. 98-1282(DRD) |
| | : | |
| Plaintiffs, | : | **O P I N I O N** |
| | : | |
| v. | : | |
| | : | |
| ESMOR CORRECTIONAL SERVICES, | : | |
| INC., et al. | : | |
| | : | |
| Defendants. | : | |

BRUCE J. RESSLER, ESQ.
ELLEN R. WERTHER, ESQ.
RESSLER & RESSLER
48 Wall Street
New York, New York 10005
        Counsel for Class Plaintiffs

FRANK R. VOLPE, ESQ.
RYAN D. NELSON, ESQ.
SIDLEY AUSTIN BROWN & WOOD LLP
1501 K Street, NW
Washington, DC 20005

LARRY S. REICH, ESQ.
BLANK ROME LLP
405 Lexington Avenue
New York, New York 10174
        Counsel for Defendant Esmor
        Correctional Services, Inc.

CARMEN E. MENDIOLA, ESQ.
286 1st Street
Jersey City, New Jersey 07302
        Counsel for Joaquin DaSilva, et al.

FRANK ASKIN, ESQ.

PENNY M. VENETIS, ESQ.
RUTGERS CONSTITUTIONAL
LITIGATION CLINIC
123 Washington Street
Newark, New Jersey 07102
  Counsel for Intervenors
  Hawa Abdi Jama, et al.

DEREK S. TARSON, ESQ.
DEBEVOISE & PLIMPTON, LLP
919 Third Avenue
New York, New York 10022
  of Counsel for Intervenors

**Debevoise, United States Senior District Judge**

  This is a class action instituted by plaintiffs, undocumented aliens who were detainees at

a facility (the "Facility") which defendant, Esmor Correctional Services, Inc., ("Esmor") operated

under contract with the Immigration and Naturalization Service ("INS") at Elizabeth, New Jersey

from August 1994 until mid-June 1995.  These detainees numbered approximately 1,600

persons.  Presently before the court are the parties' application for approval of the Settlement

Agreement, plaintiffs' application for approval of a Plan of Allocation of the settlement fund, and

the application of Class Counsel for reimbursement of expenses and payment of attorneys' fees.

  Also before the court are objections filed on behalf of former plaintiffs in Joaquin

DaSilva, et al., v. Esmor Correctional Services, Inc., Civil Action No. 96-3755(DRD) (the

DaSilva Action) and a motion to intervene and objections filed on behalf of remaining plaintiffs

in Hawa Abdi Jama, et al. v. U.S. Immigration & Naturalization Serv., Civil Action No. 97-

3093(DRD) (the "Jama Action").

## I. **Background**

Plaintiffs allege that while they were detainees at the Facility they were tortured, beaten, harassed and otherwise mistreated by Esmor guards and that they were subjected to abysmal living conditions including inadequate sanitation, exercise and medical treatment.  The details of the allegations and of the proceedings are set forth in Jama v. U.S.I.N.S., 334 F. Supp. 2d 662 (D.N.J. 2004).

Class Counsel filed the original complaint in this action in the Supreme Court of the State of New York.  On April 19, 1996 Esmor removed the action to the United States District Court for the Southern District of New York.  Class Counsel filed a motion to certify the class, after which discovery proceeded on the merits and on the issue of class certification.  Esmor opposed class certification.  Before the certification motion was decided, on March 11, 1998 the district court for the Southern District of New York transferred the action to this district.  There were then pending in this court two other actions in which individual plaintiff-detainees sought recovery for abuses suffered by them during the period of detention - the Jama Action and the DaSilva Action.

On April 2, 1998 Class Counsel filed an amended complaint and moved again for class certification.  The court granted the motion and by order dated March 10, 1999 approved the form of notice to be sent to class members.  The Class comprises all persons or entities who resided at the Elizabeth Detention Facility in Elizabeth, New Jersey, from on or about August 1, 1994 and June 18, 1995, inclusive of those dates.  Excluded from the Class are those Members who submitted valid and timely requests for exclusion from the Class in accordance with the procedures set forth in an order dated March 9, 1999, as amended by an order dated June 19, 2003.  The amended order is currently on appeal before the United States Court of Appeals for

3

the Third Circuit (Nos. 03-3095, 03-3096, and 03-3348).

Class Counsel undertook the difficult task of attempting to locate the former inmates of the Facility, all of whom had either been released, relocated to other facilities in the United States or deported.  They were able to identify and locate approximately 1,180 detainees and mailed notices to them and/or their attorneys.

The magistrate judge in charge of pretrial proceedings consolidated the Brown Action with the Jama and DaSilva actions for the purposes of discovery.  This had the unintended effect of complicating discovery and making it more time consuming, involving multiple examinations of witnesses, motions to compel and motions for protective orders.  The Jama plaintiffs had sued a large number of defendants.  The depositions of Brown plaintiffs involved 17 witnesses and consumed 24 days; the depositions of Jama plaintiffs involved 4 witnesses and took 20 days; the depositions of Esmor, INS, Esmor officers and guards involved 26 witnesses and took 117 days. These deposition were conducted during a four-year period in a number of cities across the United States.  In addition to depositions, document production proceeded on a massive scale.

Failure of plaintiffs in the Jama and DaSilva Actions to opt-out of this action in accordance with the March 9, 1999 order resulted in extensive proceedings before two magistrate judges and this court.  On June 10, 2003 the court entered an order extending the time within which the plaintiffs in those cases could opt-out.  Nine Jama plaintiffs filed opt-outs within the extended deadline; none of the DaSilva plaintiffs did so.  As a result all of the original Jama Action plaintiffs other than those nine and all of the DaSilva Action plaintiffs are members of the Class.  The status of the nine opt-outs is in doubt because of the appeal of the order extending the time to opt-out.

4

Because of the lapse of time since the inception of the case, during the summer of 2003 the court directed that a supplemental mail notice be sent to detainees at the Facility whose directly mailed Class action notices mailed in April 1999 were <u>not</u> returned as undeliverable and to the attorneys to whom class action notices were sent on April 19, 1999 and not returned.  Such notices were mailed to more than 576 detainees and/or their attorneys and, of those mailings, 456 were deliverable.

Esmor filed a motion for summary judgment dismissing the <u>Jama</u> Action on January 23, 2003.  The INS and INS officials, the Esmor officers and Esmor guards filed similar motions for summary judgment.  Certain of the key legal issues raised in those motions for summary judgment were critical to the outcome of this action, and consequently on June 26, 2003 the court directed that Esmor file its motion for summary judgment against the plaintiffs in this case by September 30, 2003 and further directed that consideration of common issues of law would be argued at a consolidated hearing.

Esmor filed its motion for summary judgment in this action.  Class Counsel were required to review and analyze the enormous record which included thousands of pages of deposition transcripts and thousands of pages of documents produced during discovery.  Oral arguments on all the motions for summary judgment were conducted on June 29 and June 30, 2004.  The key issues raised affecting this action were i) whether the INS Interim Report (which severely criticized Esmor's operation of the Facility) was admissible under Rule 803(c) of the Federal Rules of Evidence, ii) whether the plaintiffs had presented sufficient evidence of negligent hiring, retention, training and/or supervision to defeat the motion for summary judgment, iii) whether Esmor could avail itself of the government contract defense and iv) whether plaintiffs were third

party beneficiaries of the contract between Esmor and the INS governing operation of the Facility.

On September 9, 2004 the court rendered its decision on the summary judgment motion in this action. It ruled in plaintiffs' favor on issues i), ii) and iii) and in Esmor's favor on issue iv). Jama v. INS, 334 F. Supp. 2d 662 (D.N.J. 2004). In addition the court deconsolidated this case from the Jama and DaSilva Actions, noting that "[t]he Brown case is now ready to proceed to a final pretrial conference, a settlement conference, and, if no settlement is reached, a trial." The court denied an Esmor motion for a stay of settlement and/or trial pending the outcome of its appeal contesting whether the Jama plaintiffs had properly opted out of this class action.

With the case in this posture Class Counsel made extensive preparations for a settlement conference, analyzing the data, researching possible damages theories and awards and preparing memoranda. Settlement conferences were held with the court and on February 17, 2005 a settlement was agreed upon. On May 24, 2005 the court issued an Order Preliminarily Approving Settlement and Approving Form and Manner of Notice.

## II. The Settlement Terms

Under the Settlement Esmor shall pay $2.5 million on the Settlement Effective Date into an escrow account (the "Settlement Fund") controlled by Class Counsel, Ressler & Ressler. This payment will constitute the settlement of all claims relating to the operation of the Facility against Esmor and all of its current officers, directors, employees, agents, accountants, attorneys and other related parties. The fees and expenses of Ressler & Ressler, as approved by the Court will be paid from the Settlement Fund. The notice to class members of the hearing on the proposed settlement advised the recipients that the attorneys have made application for

reimbursement of costs and expenses of $200,000 and for fees in the amount of $766,667, being 1/3 of the gross amount of the settlement.  Thus the amount to be distributed to the class members will be $1,533,338 (the "Distribution Fund").

The kinds of injuries that the various members of the Class suffered varied.  Some, perhaps most, may only have had to endure the general conditions of the Facility at the particular time during which they were there; some may have undergone for a period of days or weeks the more onerous conditions of solitary confinement; some may have been physically assaulted or sexually harassed; some may have undergone body cavity searches; some may have been subjected to unjustified searches by Esmor's ERT Team; some may have been injured during the Esmor uprising that took place on June 18, 1995.  In short different members of the Class suffered different kinds of injuries.

Another unknown factor is the number of inmates who may be located so that they can share in the Settlement Fund.  Pursuant to the Settlement Agreement Class Counsel have devised a Plan of Allocation which must be approved by the court.  Each Class member is required to submit a Proof of Claim and Release which, among other things, requires the Class Member to specify the amount of time and dates spent at the Facility and the specifics of each kind of injury he or she suffered at the Facility.  The Plan of Allocation allocates a certain number of units to each kind of injury.  For example for each day spent at the Facility a detainee is awarded one unit, for a digital body search a detainee is award 15 units; for a beating by an Esmor guard a detainee is awarded 30 units per incident.

The Plan Administrator (Ressler & Ressler) will evaluate each claim and compute the total number of units to be credited to each claimant and the total number of units of all

claimants.  To obtain the value of each unit, the total number of units will be divided into the

fund to be distributed.  To determine the award of each claimant, his or her total number of units

will be multiplied by the value of each unit.  The value of each unit, of course, will depend in

part upon the number of former detainees who can be located and who file claims.  The bar date

for filing Proof of Claim Forms is November 10, 2005.

 The Settlement requires Ressler & Ressler to mail a notice of hearing to each Class

Member who can be identified through reasonable effort and to give notice by publication on the

Internet, in at least one national newspaper and in at least two ethnic newspapers.  The mailed

Notice of Hearing, among other things, informed members of the Class of the pendency of the

application to approve the Settlement, described the terms of the Settlement and advised them of

their opportunity to object and be heard at the hearing scheduled to consider its fairness,

reasonableness and adequacy.  Similarly the Settlement Agreement required Ressler and Ressler

to mail a Proof of Claim Form and Release and a Description of the Plan of Allocation to each

Class Member who can be identified through reasonable effort.

 The notice to Class Members meets the notice requirements of Fed. R. Civ. P. 23(e) as

the best notice practicable under the circumstances of this case.  Girsh v. Jepson, 521 F.2d 153

(3d Cir. 1975).

 Carmen E. Mendiola, Esq., counsel for the detainees who are the former DaSilva

plaintiffs, filed objections on their behalf, challenging the fairness, reasonableness and adequacy

of the Settlement Agreement.

 Counsel for the nine Jama plaintiffs who, this court found, successfully opted out, moved

to intervene in the Brown Action for the purposes of the hearing on the Settlement Agreement,

objected to provisions of the Settlement Agreement that they contend improperly limit the ability

of the <u>Jama</u> plaintiffs to reach a settlement of the <u>Jama</u> Action, and seek to address <u>amicus curiae</u>

one of the Settlement Agreement provisions.  The court granted the motion to intervene, holding

that the possibility that the Court of Appeals might rule that the Jama plaintiffs' opt-out was

ineffective thus making them members of the Class gave them standing to intervene.

The <u>DaSilva</u> and <u>Jama</u> plaintiffs' positions will be addressed in separate sections of this

opinion.

### III.  <u>Fairness, Reasonableness and Adequacy</u>

The fairness, reasonableness and adequacy of the Settlement Agreement is supported by

the prevailing circumstances.  Settlement of disputed claims, especially those advanced in

complex class action litigation, are favored by the courts.  The Court of Appeals affords an initial

procedural presumption of fairness of a settlement if adequate notice was given to affected

members of the proposed settlement class and "if the court finds that (1) the negotiations

occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement

are experienced in similar litigation; and (4) only a small fraction of the class objected."  <u>In re</u>

<u>Cendant Corp. Litig.</u>, 264 F. 3d 201, 233 n.18 (3d Cir. 2001).  As described above, each of these

four factors was fully met in this case.

Beyond these procedural criteria, courts in this Circuit apply the nine-factor test

enumerated in <u>Girsh v. Jepson</u>, 521 F. 2d 153, 157 (3d Cir. 1975).  Applying these factors the

court concludes that the settlement for $2.5 million in cash is fair, reasonable and adequate.

a.  <u>Complexity, expense and likely duration</u>: Esmor has denied wrongdoing and liability.

It vigorously, through able counsel, defended the action up to the point of settlement and would

no doubt continue to do so absent a settlement, defending through continued class action and expert discovery, further class certification objections, trial and, if unsuccessful at trial, on appeal.  It is not unrealistic to estimate that, at best many more years would be required to conclude this case.

As described above this action has continued more than nine years.  In its own right it raises complex factual and legal issues and intensive discovery was required, including the depositions of 47 separate witnesses during the course of approximately 161 days.  The case was further complicated by the existence of an interrelationship with the parallel <u>Jama</u> and <u>DaSilva</u> Actions.  Further the Class members were a transient body of persons.  Some were released from confinement but most were transferred from institution to institution or deported.  This made the job of assembling data relating to liability and damages extraordinarily difficult.  The dispositive motions raised complex issues requiring extensive review of the enormous record and the briefing and argument of difficult issues.

b.  <u>Reaction of the Class to the Settlement</u>: Throughout these proceedings there has been no indication that the members of the Class have been anything but satisfied with the manner in which Class Counsel have handled these proceedings.  Class Counsel have been in direct communication with members of the Class, all of whom are eager for a prompt settlement and the end to delay.  The only objections to fairness, reasonableness and adequacy of the Settlement came from the <u>DaSilva</u> plaintiffs, who still, through counsel, contend that they are not members of the Class.  They offer no basis whatsoever for their objections.  Counsel for the <u>Jama</u> plaintiffs did not object on grounds of fairness, reasonableness and adequacy in their papers but voiced objections as to the amount at the hearing.

c. <u>Stage of Proceedings and Discovery</u>: Discovery has been completed and all that remains to be accomplished before a trial is expert discovery and a final pretrial conference. All available factual data relating to liability has been assembled and tested in the crucible of summary judgment motions both in this case and the <u>Jama</u> Action.

d. <u>Risk of Establishing Liability and Damages</u>: In its opinion resolving Esmor's summary judgment motion the court found that Class plaintiffs have presented substantial evidence in support of their contentions that while they were detainees at the Facility some of them were tortured, beaten, harassed, and otherwise mistreated by Esmor guards, and that they were subjected to abysmal living conditions including inadequate sanitation, exercise and medical treatment. The court also found that the Class plaintiffs had presented ample evidence to support their claims that Esmor was negligent in the hiring, retention, training or supervision of its guards. It must be noted that these findings were in the context of summary judgment motions in which all reasonable inferences had to be drawn in favor of plaintiffs. Esmor vigorously denies these allegations and evidence was developed during the course of discovery favorable to it. The difficulty of proving liability is compounded by the fact that plaintiffs may have great difficulty in arranging for critical witnesses to be available for trial. Some may have been deported; some may have been transferred within the United States to presently unknown institutions. Obtaining the presence of detained plaintiffs may be difficult or impossible.

The proof of damages would likely be even more difficult. As noted above, the kinds of injuries that plaintiffs suffered varied dramatically. Establishing damages at trial might require separate mini-trials for each type of detainee, ranging from those who suffered only the daily conditions of detention to those who suffered alleged multiple instances of specific abuse.

Difficulty in obtaining the presence of witnesses as to damages would be the same as the difficulty in obtaining witnesses to testify about liability issues.

The settlement cuts through these problems, enabling plaintiffs to avoid the risk of being unable to establish liability and damages.

e. <u>Risks of Maintaining Class Action Through Trial</u>: There is always the risk that the class action status might not be maintained through trial.  If it could not be maintained the value of the action would decline precipitously.  In the usual case that has proceeded up to trial as a class action the risk of decertification is slight.  Here the risk is somewhat greater in light of the difficulty in maintaining communication with the members of the class and the great disparity in the kinds of injuries which the class members are alleged to have suffered.  Settlement eliminates this risk.

f. <u>Ability of Esmor to Withstand a Greater Judgment</u>: The court has been informed that at least one substantial judgment has been entered against Esmor in an unrelated case.  Esmor maintains insurance for claims arising from this class action in an amount that is greater than the $2.5 million provided for in the Settlement, but the extensive expense of these consolidated cases has exhausted most of the excess coverage.  Settlement negotiations were undertaken directly with Esmor's primary insurance carrier during settlement discussions in the presence of the court, and it became apparent that the amount of this Settlement is the maximum amount the carrier is willing to pay.  While perhaps Esmor could pay more now, it is a question whether it would be in a position to pay more after a trial and possible appeals given the existence of other litigation against it and the substantial other liabilities to which it may be subject.

g. <u>Reasonableness of the Settlement Fund</u>: The pro rata recovery per plaintiff will depend

not only on the number of units allocated under the Allocation Plan, but also depends on the total number of Class members who file timely proofs of claim.  It is true that in some single plaintiff claims in prison or detention cases there have been recoveries substantially higher than the individual recoveries that can be anticipated in this case.  However, those recoveries for the most part have come after trial.  As noted above, a trial in this case would impose heavy burdens. The time required to complete a trial and resolve a likely appeal if plaintiffs were successful would entail a certainty of years of additional delay and the possibility that at the end of it all Esmor might not be in a position to pay a substantial judgment.

The judgment of skilled counsel who have had extensive experience in class action litigation and who have pursued this case with great vigor is entitled to considerable deference. Here Class Counsel are of the opinion that "[t]his Settlement represents the maximum amount of recovery that can reasonably be expected under the circumstances of this case, particularly in view of the substantial delay in payment that has resulted from the years of litigation in this class action."  This opinion is fully supported by the facts concerning this litigation to which the court has had long exposure.

In light of all the circumstances the court has no hesitancy in finding that the Settlement is fair, reasonable and adequate.

## V.  The DaSilva Plaintiffs' Objections

In 1996 Carmen E. Mendiola, Esq., filed an action on behalf of eleven named former detainees of the Facility.  As in the Jama Action, the DaSilva plaintiffs were subject to the court's Brown Action class certification order dated August 24, 1998.  A March 9, 1999 order provided that if they wished to opt out of the Class they should do so by June 1, 1999.  Like the Jama

13

Action plaintiffs they failed to opt-out by the specified date.  There followed extended proceedings before two magistrate judges during which additional orders were entered extending the date by which the DaSilva and Jama plaintiffs could opt out.

Esmor and the Brown plaintiffs moved for an order declaring that the DaSilva and Jama plaintiffs had failed to opt-out of the Class and consequently were Class members.

Despite the extraordinary failure of both sets of plaintiffs over an extended period of time to take the very simple steps required to opt out of the Class Action, the Court denied Esmor's and the Brown plaintiffs' motion because of the unusual circumstances in this case, namely the widespread dispersal of the former facility inmates throughout this country and abroad.  The Court ordered that opt-outs be filed by March 20, 2003.  Any DaSilva or Jama plaintiff who did not opt out by that date would be deemed a member of the Class.  Nine of the original Jama plaintiffs filed proper opt-out notices within the specified time; the rest of the original Jama plaintiffs became members of the Class.  Surprisingly, none of the DaSilva plaintiffs filed any form of opt-out notice by March 20, 2003, and all of them became members of the Class. Consequently, by order dated October 14, 2003 the court dismissed the DaSilva complaint without prejudice and allowed the DaSilva plaintiffs to join the Brown Class Action.  Ms. Mendiola continues to represent them.  Esmor and the Brown Action plaintiffs appealed the order permitting the Jama and DaSilva plaintiffs to opt out.  The Brown Action plaintiffs subsequently withdrew their appeal, but Esmor is actively prosecuting its appeal.  Briefing has just been completed.

Through Ms. Mendiola the DaSilva plaintiffs have filed objections to the Settlement Agreement in the Brown Action.  As Class Counsel note, these objections were filed after the

deadline specified in the May 24, 2005 Order Preliminarily Approving Settlement and could be rejected on that ground.  However, addressing the objections on the merits is helpful to a complete understanding of this case and the related Jama and DaSilva Actions.

The August 1, 2005 letter setting forth the objections impliedly criticizes the failure of the Brown Action plaintiffs to serve her clients individually with the Notice of Hearing and other papers that the court ordered be served on members of the Class, stating "[c]ounsel for DaSilva Plaintiffs ONLY received a copy of the Notice of Hearings on Proposed Settlement and a copy of The Plan of Allocation for Distribution to the Qualified Members of the Brown Class Action." However, because Ms. Mendiola continued to represent the persons who had been the DaSilva plaintiffs she was precisely the person who should have been served on their behalf.  Presumably she has been in communication with them and ascertained that they do not wish to take advantage of the Settlement as agreed upon.

The DaSilva plaintiffs' objections contain a number of misstatements.  First, they boldly asserts that "[t]he seven DaSilva Plaintiffs validly opted out of the Brown class action."  That is simply not true.  The DaSilva plaintiffs had not opted out before the Brown Action plaintiffs and Esmor moved for an order declaring that the Jama and DaSilva plaintiffs had failed to opt out. Unlike nine of the Jama plaintiffs, none of the DaSilva plaintiffs took advantage of the opportunity the court gave them to opt out by the greatly extended date of March 20, 2003. Consequently none of the DaSilva plaintiffs ever opted out and they are unquestionably members of the Class.  That is what gives them unquestioned standing at this time to object to the Settlement Agreement.  It is inconceivable that the Court of Appeals would find that the DaSilva plaintiffs had opted-out.

15

Second, the <u>DaSilva</u> plaintiffs' objections state that "[s]hould the Court permit the Proposed Settlement to go forward, the <u>DaSilva</u> Plaintiffs will receive no monetary award and would be left with nothing."  Further, the objections state "[i]t appears that no provisions have been made for the <u>DaSilva</u> Plaintiffs under the Settlement Agreement."  Again this is simply not true.  The <u>DaSilva</u> plaintiffs are members of the Class and as such are entitled to their share of the Settlement fund as provided in the Plan of Allocation.  They must file a Notice of Claim and other documents called for in the Settlement Agreement on or before November 10, 2005.  Let us hope that their counsel will be more diligent in securing from them and filing in a timely manner the claim forms than she was in obtaining opt-out forms.

Apart from these misstatements the objections of the <u>DaSilva</u> plaintiffs have no substance.  Their principal objection is "[t]he DaSilva Plaintiffs also request that this Court decline to approve the settlement agreement as it is empowered to do under Fed. R. Civ. P. 23(e)(1)(C) upon a finding that the proposed settlement agreement is not 'fair, reasonable, and adequate.'" The only support that the <u>DaSilva</u> plaintiffs advance for this contention in their papers is their "[adoption] in [their] entirety the legal arguments and submissions of the <u>Jama</u> Plaintiffs as if fully set forth herein."    The <u>Jama</u> Plaintiffs, however, have advanced no criticism of the fairness, reasonableness and adequacy of the Settlement Agreement insofar as it relates to the <u>Brown</u> Action plaintiffs (included among whom are the <u>DaSilva</u> plaintiffs).  Therefore the <u>DaSilva</u> plaintiffs did not advance in their papers a single ground for their contention that the Settlement Agreement is not fair, reasonable and adequate.  At the hearing Ms. Mendiola elaborated on the contention that the settlement fund was inadequate.

The <u>DaSilva</u> plaintiffs' objections "incorporate in full the <u>Jama</u> Plaintiffs' opposition to

16

the proposed settlement agreement." This objection makes absolutely no sense. The court has held that nine of the Jama plaintiffs opted out of the Brown Class Action and thus can pursue an independent action against Esmor and other defendants. What the Jama Plaintiffs are objecting to is the provision in the Settlement Agreement that obligates Esmor to settle with the Jama plaintiffs on terms no more favorable than the terms on which it settles with the Brown Action plaintiffs. This provision of the Settlement Agreement has absolutely no effect upon the DaSilva plaintiffs. Unlike the Jama plaintiffs, the DaSilva plaintiffs are not conducting a separate action. Unlike the Jama plaintiffs they cannot negotiate a separate settlement.

Finally, DaSilva counsel note that the Brown Action attorneys have applied for reimbursement of costs and expenses of $200,000 and for attorneys' fees in the amount of $766,667. DaSilva Action counsel contends that from these costs and expenses and counsel fees, counsel for the DaSilva plaintiffs should be awarded her costs and expenses. That is not an issue to be decided at this juncture. Normally lead counsel decides how the awarded counsel fees should be distributed in accordance with each class action's counsel's contribution to the efforts to secure the class action award. The question of Ms. Mendiola's entitlement to share in the attorneys' fees can be dealt with later. The objections to the Settlement that the DaSilva plaintiffs advance have absolutely no merit.

## VI.  **The Jama Plaintiffs' Objections**

The status of the Jama Plaintiffs has been described previously. To summarize, the court has held that nine of the original Jama Plaintiffs opted out of the Brown Action. This ruling is now the subject of Esmor's appeal. However, at least until the Court of Appeals issues its decision, the Jama Action is totally separate and distinct from the instant Class Action in which

17

settlement has been reached.

As far as the appeal is concerned three scenarios present themselves.  The Court of Appeals may decide that it lacks jurisdiction and dismiss the appeal, in which event the Jama Action will proceed independently with the opt-out issue remaining to be decided upon on an appeal from a final judgment in that case.  Second, the Court of Appeals could take jurisdiction and affirm the order of this court, in which event the Jama Action would proceed independently as it is now proceeding.  Third, the Court of Appeals could take jurisdiction and reverse the order of this court, in which event the Jama Plaintiffs would become members of the Brown Action Class entitled to their share of the settlement fund.

In these circumstances the Jama Plaintiffs have, i) moved for intervention for the purposes of the hearing on the Settlement Agreement and ii) filed objections to the Settlement Agreement.

Class Counsel contend that as matters now stand the Jama plaintiffs are not members of the Class, having effectively opted out, and thus they have no standing to object to any of the provisions of the Settlement.  Class Counsel point out, correctly, that the Settlement "is an integrated whole and cannot be cherry picked by Jama plaintiffs, who themselves are not parties to the Agreement, without undermining the entire agreement."  The effect of acceding to their objections "would dismantle the Settlement reached after years of litigation, lengthy negotiations, and further delay the process."

The court agrees with Class Counsel that the so-called "most favored nation" clause appearing in §3.7 of the Settlement Agreement does not confer standing upon the Jama plaintiffs even if it does have the effect of making it more difficult to settle their own action, e.g., In re

Vitamins Antitrust Class Actions, 215 F.3d 26 (D.C. Cir. 2000). The Jama plaintiffs remain free to pursue their separate claims litigation. The "most favored nations" provision ensures that the Brown plaintiffs receive the greatest recovery possible under the circumstances of the case and that other similarly situated detainees who are not class members receive no additional amounts in settlement from Esmor than Class members under the Plan of Allocation.

For another reason the Jama plaintiffs' motion to intervene should be granted. Unlike the DaSilva plaintiffs, the Jama plaintiffs are not members of the Class. However, there is the possibility that the Court of Appeals will reverse this court's order which gave recognition to the opt-outs of the nine Jama plaintiffs. In that event the Jama plaintiffs will become Class members. This possibility is sufficient to give them standing to participate in the Settlement Agreement hearing and their motion to intervene will be granted.

The principal objection is to the requirement contained in Section 3.7 of the Settlement Agreement that on any settlement of the Jama Action the amounts paid to the plaintiffs in the Jama Action shall be on a basis no more favorable than the amounts paid to the Brown Class members. Initially the Jama Plaintiffs find this language ambiguous, leaving in doubt what amount could be paid a Jama Plaintiff.

An examination of the Settlement Agreement and the Plan of Allocation establishes the meaning of this provision. As described above the Plan calls for an allocation of units to each Class member in accordance with the injuries he or she suffered. The value of each unit is determined in accordance with the Plan. The Class member is entitled to the sum determined by multiplying his or her number of units times the unit value.

To determine whether a Jama Plaintiff is treated more or less favorably than Brown Class

members one need only calculate the number of units to which the <u>Jama</u> Plaintiff would be entitled under the Plan of Allocation and multiply that number by the unit value computed in the <u>Brown</u> Action.  If any proposed settlement were to provide the <u>Jama</u> Plaintiff with a greater award than that computed in this manner he would be being paid on a basis more favorable than the amounts paid to the <u>Brown</u> Class.  There is no ambiguity in §3.7.

The <u>Jama</u> Plaintiffs contend that "the <u>Brown</u> parties have no right to limit the ability of non-parties to negotiate [a] settlement", which, they argue, is the effect of §3.7 and §3.1, which sets a $2.5 million settlement cap on the amount Esmor will be required to pay under the Settlement Agreement.  The <u>Jama</u> Plaintiffs concede that "there is no impediment to the <u>Brown</u> parties including a provision in the Settlement Agreement commonly called a 'Most Favored Nations' clause".  Such a clause provides that the settlement with class members is subject to escalation if more favorable terms are offered to other groups of plaintiffs.

While not so worded, as a practical matter §§3.7 and 3.1 of the Settlement Agreement have that effect.  Were Esmor to agree to more favorable terms with the <u>Jama</u> Plaintiffs and also agree to make those more favorable terms applicable to the <u>Brown</u> Plaintiffs, unquestionably Esmor and the <u>Brown</u> plaintiffs would consent to them.  At the hearing Class Counsel and Counsel for <u>Esmor</u> took under advisement whether they would amend § 3.7 to make this more clear.  Whether they do or do not, § 3.7 is a permissible "Most Favored Nations" clause.

The <u>Jama</u> Plaintiffs object to the so-called "Equitable Treatment Order" provided for in §3.7 of the Settlement Agreement.  That provision requires that should Esmor enter into any settlement with the <u>Jama</u> Plaintiffs, it must obtain a court order that the Settlement is not more favorable than that which the <u>Brown</u> Class members receive.  The <u>Jama</u> Plaintiff characterizes

this provision as an unprecedented interference by the court into the settlement terms of a litigation between private parties outside the context of a class action suit.  On the contrary, this provision is simply a vehicle in this action to ensure that the settlement of this action is complied with.

Finally the <u>Jama</u> Plaintiffs seek to proceed as <u>amicus curiae</u> to challenge the provision of §3.3 which provides that the Class members shall not receive any moneys until "there is a final non-appealable order in the . . . <u>Jama</u> action regarding the challenges to the Court's opt-out orders."  They note that the effect of this provision is to permit payment of attorneys' fees immediately but to delay payment to members of the class possibly until the conclusion of the <u>Jama</u> Action if the Court of Appeals does not accept jurisdiction of the Esmor appeal.  There is no need for the <u>Jama</u> Plaintiffs to advance this claim <u>amicus curiae</u>.  They have standing in this proceeding by virtue of the fact that they may become members of the Class and their motion to intervene has been granted.  Their contentions concerning the timing of payment to the Class members will be treated as an objection to the Settlement Agreement.

The Settlement Agreement does not contemplate waiting until the final judgment in the <u>Jama</u> Action to pay the Class members; it contemplates waiting until Esmor's appeal is resolved at which time it will be known whether the <u>Jama</u> plaintiffs are members of the Class.  Final computation of the value of the units could be determined at that time.  The provision was included in part to protect the interests of the <u>Jama</u> Plaintiffs, to ensure that they would share in the Settlement Fund should they find themselves members of the class.

The <u>Jama</u> Plaintiffs cost totally unjustified aspersions on Class Counsel, charging that they seek to secure prompt payment of their fees with no regard to when members of the Class

will be paid.  They refer to the 2003 period in these proceedings when Class plaintiffs and Esmor were challenging the validity of the opt-outs.  One of the grounds for the challenge was that the existence of the two independent actions stood in the way of a settlement.  The court expressed its concern that this joint effort might be in furtherance of a sweetheart deal between Class Counsel and Esmor.

Subsequent events have proved these concerns to be totally unfounded.  The vigor with which Class Counsel pursued this case on the merits and negotiated the Settlement Agreement belies any suggestion of less than aggressive advocacy.  For a considerable period, given the limited fees they will be paid, Class Counsel have been acting in effect as pro bono counsel advocating the interests of a class of hundreds of former Esmor detainees.

Section 3.3 of the Settlement Agreement does not by its terms contemplate delaying payment to Class members until final resolution of the Jama Action.  It contemplates holding off such payment until the Court of Appeals decides the appeals from this court's order giving effect to the Jama plaintiffs' opt-outs.  It is expected that such a decision will be forthcoming soon, perhaps before the amounts owing to the Class members have been computed.  If an unexpected delay develops the court is confident that the parties to the Settlement Agreement will be able to devise ways to accelerate payment.

For example, two computations of payments to Class Action members can be made, one which does not include the Jama Plaintiffs and one which includes the Jama Plaintiffs.  If the Court of Appeals affirms this court's opt-out order, payment will be made in accordance with the first computation.  If the Court of Appeals reverses this court's opt out order payment will be in accordance with the second computation which, of course, will include the Jama Plaintiffs.  If

there is a protracted delay in the issuance of the Court of Appeals decision these could be a partial distribution to Class Members based on the second computation with the Jama plaintiffs' share held until a final Court of Appeals decision.

There should be no difficulty making these computations because the Jama Plaintiffs will have to file conditional proofs of claim and releases prior to the November 10, 2005 cut-off date. Were they to fail to do so and if they were held to be members of the Class they would lose their right to recover in the Class Action and they would be precluded from pursuing their own action. Surely Jama Action counsel will not permit their clients to fall into that trap.

## VII.  Attorneys' Fees and Expenses

Class Counsel seek approval of its attorneys' fees of $766,667, an amount equal to 1/3 of the Settlement proceeds plus expenses of $200,000 incurred during the course of this representation consisting of $196,273.89 already incurred and $3,726.11 which is an estimated amount to cover expenses to be incurred for giving the required notice to the Class, securing approval of the Settlement Fund, analyzing Proofs of Claim, implementing the Plan of Allocation and making distributions to Class Members.

It is universally recognized in the courts that attorneys who generate a fund of recovery for the benefit of a class should be fairly compensated.  Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980).  Application of a portion of the collected fund to the payment of attorneys' fees spreads the payment proportionately among those who benefitted from the suit.  It encourages attorneys to undertake these kinds of difficult cases.

The Court of Appeals for the Third Circuit, as well as the courts of many other circuits, have expressed a preference for awarding attorneys' fees from a common fund pursuant to the

percentage of the fund method of calculation.  In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions, 148 F. 3d 288, 333 (3d Cir. 1998).  This method is an alternative to the lodestar method in which a fee is computed by multiplying the reasonable number of hours the attorneys expended on the case by the rates charged by comparable attorneys in the area in which the services were rendered.  To arrive at the ultimate fee, this lodestar figure is usually multiplied by a factor to reflect the degree of success, the risk of non-payment the attorneys faced and perhaps the delay in payment that they encountered.  But, as noted, the preference is for computing the award on the basis of a percentage of recovery, perhaps checking the result against a lodestar computation to ensure that is not grievously out of line.

The amount of the percentage varies case to case, 15%, 20%, 25%, 30%, 33⅓%, 38% having been awarded.  A 30% or 33⅓% percentage is quite common.  The court has reviewed the various factors that govern the determination of an appropriate percentage and concludes that the requested 33⅓% of the cash recovery is more than reasonable.  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000).

In fact this particular case illustrates why it is reasonable to award attorneys who take on contingent fee cases which produce a fund in court compensation that exceeds a fee based on a regular hourly rate.  This kind of compensation reflects the fact that these attorneys run the risk that they will not prevail in some of their cases and will receive no compensation for a very substantial amount of work.  Here, although Class Counsel prevailed, by reason of the difficulty of the case and the unexpected complications caused by the existence of the parallel Jama and DaSilva Actions the contingent fee which they agreed to take at the outset and which is now requested is substantially less than comparable attorneys would earn charging market rates.

Nevertheless, the court will analyze the request in accordance with the usual criteria for evaluating attorney fee applications.

The proposed settlement, as noted above, appears to be favorable to the Class, conferring an immediate cash benefit.

No members of the Class voiced objections to the attorneys' fee request.

Class Counsel undoubtedly possess great skill and experience in this kind of case, and they exhibited that skill and experience during the course of these proceedings.

This action, by reason of the difficulty in maintaining access to the detainee plaintiffs and by reason of consolidation for discovery purposes with the multi-defendant, multi-issue Jama Action was unusually complicated. The extensive discovery efforts and motions going to the merits have already been described. Because of the nature of the Settlement and the necessity of implementing the Allocation Plan after approval of the Settlement, the need for the attorneys' services will continue. The negotiations leading to the Settlement required extensive preparatory efforts and conferences with the court and counsel.

There was from the outset a substantial risk of non-payment. The difficulties of proving both liability and damages have already been described. Even if those risks were not significant there was the significant risk of Esmor's inability to pay. During the course of this case Esmor had been successfully sued for claims arising from abuses of detainees at its other facilities and one significant case in Texas resulted in a jury verdict of more than $38 million. Esmor has posted a bond of $25 million pending appeal. Esmor's insurance carriers had commenced litigation disclaiming coverage in that case. These developments suggested that Esmor's ability to pay a judgment ultimately obtained against it was at risk.

The total size of the Fund is $2.5 million.  A 33⅓% attorneys' fee award is well within the range of awards in cases obtaining comparable recoveries.  The potential number of persons who can benefit from the award is approximately 1600 detainees who were undocumented aliens seeking political asylum in the United States who were detained in the Facility pending determination of their status.  Efforts to locate the Class members during the course of the litigation have resulted in effective notice being given to at least 456 of these detainees and/or their attorneys.  It is reasonable to assume that after notice of the Settlement is effected as provided in the Settlement Agreement at least this number of persons will have the opportunity to apply for and receive their portion of the Settlement Fund pursuant to the Plan of Allocation.

A lodestar cross-check fully confirms the reasonableness of the attorneys' fee request. Rite Aid Corporation Securities Litigation, 396 F.3d 294, 305 (3d Cir. 2005).  Throughout the nine years of this litigation five experienced attorneys from Ressler & Ressler worked on the case.  The total amount of time expended was 11,115 hours.  The nature of the work is set forth in time records accompanying the fee application.  Without conducting an item by item evaluation, the court is sufficiently familiar with this case to conclude that these hours were reasonably spent prosecuting this action.  The time recorded for the individual attorneys is as follows:

| Attorney | Hours |
|---|---|
| Bruce J. Ressler | 1516.6 |
| Ellen R. Werther | 1357.69 |
| David Paul Horowitz | 1777.4 |
| Richard L. Bernstein | 6363.92 |

| | |
|---|---|
| Brian Odza | 99.0 |
| Total | 11,114.51 |

Plaintiffs' attorneys have not set forth their normal billing rates for these attorneys (which probably increased from time to time during the pertinent nine year period).  A reasonable hourly rate for Mr. Ressler and Ms. Werther is $550; for Mr. Horowitz and Mr. Odza, $350; for Mr. Bernstein $450.  Applying these rates, if my arithmetic is correct, the lodestar would be more than double the amount of the Settlement Fund, in this case without the application of a multiplier.  Looking at the fee request in another way, a fee of $766,667 represents an average blended billing rate of less than $70 per hour.

These figures do not suggest that the Settlement Fund is inadequate; rather they evidence the fact that on occasion attorneys who undertake to represent a class have to continue that representation even though the circumstances require that they expend vast amounts of time for which they will not be adequately compensated.

There is no question that the requested attorneys' fees are reasonable from the perspective of the Class.  They will be approved.

Similarly the request for reimbursement of $196,273.89 of expenses to date will be approved as will the request for payment of $3,726.11 for expenses expected to be incurred in the future to implement the Settlement Agreement.  The expenses incurred to date have been set forth in a schedule that accompanies the application.  All appear to be reasonable.  Similarly $3,726.11 is an under-estimate of the expenses to be incurred during the process of giving notice to Class members and distributing the Settlement proceeds among participating Class members.

## VI.  Conclusion

27

Orders will be entered granting the motion of the Jama Plaintiffs to intervene in the hearing on the Settlement Agreement, approving the Settlement of the Class Action as fair, reasonable and adequate, approving the Plan of Allocation and allowing attorneys' fees in the amount of $766,667 and expenses incurred and to be incurred in the amount of $200,000.

  /s/ Dickinson R. Debevoise  

Dated: August 10, 2005                          DICKINSON R. DEBEVOISE
                                                           U.S.S.D.J.

28